PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

and

4219 UNIVERSITY DRIVE, FAIRFAX, VIRGINIA; $28,534.22 IN FUNDS SEIZED FROM PNC BANK ACCOUNT NO. ENDING IN 4269,

       *Defendants,*

v.

DUYGU KIVANC; TURAN KIVANC,

       *Parties-in-Interest-Appellants.*

No. 12-1321

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:11-cv-00641-LO-TCB)

Argued: January 30, 2013

Decided: April 26, 2013

Before WILKINSON, KEENAN, and WYNN,
Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Wilkinson and Judge Keenan concurred.

---

## COUNSEL

**ARGUED:** Jeffrey Steven Jacobovitz, ARNALL GOLDEN GREGORY, Washington, D.C., for Appellants. Karen Ledbetter Taylor, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Brian D. Harrison, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

## OPINION

WYNN, Circuit Judge:

In this case, a federal jury found that the defendant properties — a residence and proceeds seized from a bank account — were subject to civil forfeiture. Specifically, the jury found that each property derived from the proceeds of a health care fraud and money laundering scheme committed by Dr. Mert Kivanc—the son of Turan and Duygu Kivanc ("Claimants"). Claimants, who own the properties, unsuccessfully contested the properties' forfeiture before the district court.

On appeal, Claimants contend that the district court erred by denying their motions to dismiss, to permit remote testimony, and for judgment as a matter of law. Claimants further argue that the district court mistakenly prohibited the admission of certain documents and refused to give their proposed jury instructions. For the reasons below, we affirm the district court's various rulings.

I.

The Federal Bureau of Investigation ("FBI") first began investigating Dr. Kivanc, a physician who operated a medical

practice in Falls Church, Virginia, in April 2005, after receiving a report from a former patient that Dr. Kivanc was over-prescribing controlled substances. This former patient alleged that Dr. Kivanc prescribed her "whatever drugs she wanted" without performing a physical exam or medical tests. J.A. 1978. In October 2010, Dr. Kivanc was indicted for distributing and conspiring to distribute controlled substances. The government has not, however, arrested Dr. Kivanc because in November 2007, he fled the United States for Turkey.

On October 18, 2006, in the course of the FBI's investigation of Dr. Kivanc's alleged illegal distribution of prescription drugs, FBI Agent Aaron Weeter interviewed two of Dr. Kivanc's former employees and learned of a health care fraud scheme involving Remicade, a relatively expensive antibody drug that is infused into the vein to control certain autoimmune diseases such as rheumatoid arthritis.

In 2007, the FBI began investigating the allegations of Dr. Kivanc's Remicade health care fraud scheme. FBI agents interviewed Dr. Kivanc's former employees and patients, analyzed his billing, supply, and bank records, and discovered evidence indicating that Dr. Kivanc had engaged in a scheme to defraud his patients' health care benefit programs through several methods of fraudulent Remicade billing. Khoa Nguyen-Dr. Kivanc's former medical assistant who pled guilty to conspiring to distribute controlled substances-testified at trial that he and Dr. Kivanc employed four main methods of fraudulent Remicade billing: (1) billing for more Remicade than the patients actually received; (2) billing for Remicade infusions when the patients received a less expensive steroid medication; (3) billing for Remicade infusions when the patients did not receive any infusions; and (4) billing for Remicade paid for by other patients' health care benefit programs. In April 2011, Dr. Kivanc was indicted for health care fraud and conspiracy to commit health care fraud based on the Remicade scheme.

Colleen Seres, an FBI forensic accountant who reviewed documents related to Dr. Kivanc's investigation, testified at trial that during the period of November 1, 2005, through October 31, 2007, 60% of Dr. Kivanc's Remicade billing was for Remicade supply that he did not possess. Seres calculated that Dr. Kivanc fraudulently collected at least $948,590 in Remicade billings from seven health care benefit programs. Seres traced $701,507 in fraudulent Remicade payments to Dr. Kivanc's medical practice business account ending in 9232 at Wachovia Bank ("Wachovia Business Account").

Claimants originally purchased the residential property at 4219 University Drive, Fairfax, Virginia ("Defendant Real Property") in 1993. In September 2005, Claimants transferred Defendant Real Property to Dr. Kivanc for $625,000. The same day, Dr. Kivanc obtained a $288,000 mortgage on the property. In February and March 2007, Dr. Kivanc wrote a series of five checks totaling approximately $196,000 from his Wachovia Business Account to pay the mortgage loan. Seres testified that she traced these five checks to Remicade proceeds. Shortly after Dr. Kivanc made these payments, the mortgage was paid in full as evidenced by a certificate of satisfaction dated April 16, 2007.

In February 2007, Dr. Kivanc hired a construction contractor, Michael Daughtry, to completely renovate Defendant Real Property. Dr. Kivanc approved Daughtry's renovation design, and Daughtry submitted the bills for the renovation project to Dr. Kivanc.

On May 30, 2007, while the renovation project was ongoing, Dr. Kivanc executed a deed transferring Defendant Real Property back to Claimants for $625,000. Daughtry testified that he did not know that Dr. Kivanc sold Defendant Real Property to Claimants in May 2007, and he did not even meet Claimants until the fall of 2007. Dr. Kivanc continued to pay Daughtry for the renovation project in person until late October 2007, just before Dr. Kivanc fled to Turkey. From that

point forward, Dr. Kivanc's brother paid Daughtry with checks drawn on Dr. Kivanc's business account. Claimants moved into Defendant Real Property sometime in 2008.

Seres testified that Dr. Kivanc paid a total of approximately $469,000 for the renovation project via a series of sixty-eight checks written from his Wachovia Business Account. Dr. Kivanc paid approximately $430,000 of that amount after the deed transferring the property to Claimants was recorded on June 5, 2007.

Between November 2006 and May 2007, Dr. Kivanc also wrote four checks totaling $446,780 to his father, Turan, from his Wachovia Business Account. Seres traced these four checks to Remicade payments. Further, Seres traced one of these checks—dated January 7, 2007, and in the amount of $123,180—from its date of deposit into Claimants' bank account through July 2011, when the United States Marshals Service seized the remaining $28,534.22 from Claimants' bank account ending in 4269 at PNC Bank ("Defendant Bank Account").

On June 15, 2011, the government filed a verified complaint for forfeiture in rem against Defendant Real Property alleging that it was subject to forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(A) and (C) as property derived from health care fraud proceeds and involved in money laundering. On August 4, 2011, the government filed an amended complaint adding Defendant Bank Account. Claimants filed a verified claim of interest for both properties.

Claimants then filed a motion to dismiss, arguing that the statute of limitations barred the action. The district court denied that motion.

Claimants also filed motions to permit Turan and Dr. Kivanc to testify at trial remotely from Turkey. In support of Turan's motion, Claimants submitted two letters from Turan's

doctor in Turkey stating that his health prevented him from traveling to the United States, and the government submitted an opposing letter from an American doctor. The district court denied both motions.[1]

The government filed a motion in limine to admit Dr. Kivanc's statements against his interest into evidence at trial. Claimants opposed the motion and argued that if the court admitted Dr. Kivanc's statements, Federal Rule of Evidence 106 should permit them to introduce an affidavit filed by Dr. Kivanc and a letter Dr. Kivanc wrote to his attorney. The district court conditionally granted the government's motion but denied Claimants' request to introduce Dr. Kivanc's affidavit and letter.

The case was tried before a jury in February 2012 in the United States District Court for the Eastern District of Virginia. At the close of the government's evidence and all of the evidence, Claimants moved for judgment as a matter of law under Rule 50, which the district court denied. Additionally, the district court rejected some of Claimants' proposed jury instructions, including their theory of the case instruction and proportionality instruction as applied to money laundering.

The jury returned a verdict in the government's favor, finding that the government proved by a preponderance of the evidence that Dr. Kivanc conspired to commit health care fraud and committed money laundering, that the defendant properties derived from health care fraud proceeds, and that the defendant properties were involved in concealment and transactional money laundering. The district court entered judgment accordingly, and Claimants appealed.

---

[1]The government filed a motion to subpoena Dr. Kivanc; that motion was granted.

## II.

On appeal, Claimants contend the district court erred by: (1) denying their motion to dismiss; (2) denying their motions to permit Turan and Dr. Kivanc to testify remotely; (3) admitting Dr. Kivanc's hearsay statements yet prohibiting the admission of Dr. Kivanc's affidavit and letter to his attorney; (4) failing to give their requested jury instructions; and (5) denying their Rule 50 motion for judgment as a matter of law.

## A.

Claimants first contend that the district court erred by denying their motion to dismiss because the statute of limitations barred the action.

In an appeal from an in rem civil forfeiture proceeding, we review a district court's factual findings for clear error and its conclusions of law de novo. *United States v. Undetermined Amount of U.S. Currency*, 376 F.3d 260, 264 (4th Cir. 2004). The district court's determination of when the government discovered an alleged underlying offense and the related triggering of the statute of limitations under 19 U.S.C. § 1621 is a factual determination reviewed for clear error. *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502 (6th Cir. 1998).

The statute of limitations is an affirmative defense that may be raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005). Under Section 1621, the government has "five years after the time when the alleged offense was discovered" to initiate forfeiture proceedings. 19 U.S.C. § 1621; *United States v. Minor*, 228 F.3d 352, 360 (4th Cir. 2000). Courts apply a known or should-have-known standard to Section 1621, meaning that "an offense is discovered when the [g]overnment discovers or possesses the means to discover the alleged wrong, whichever occurs first." *$515,060.42*, 152

F.3d at 502; *see also United States v. James Daniel Good Prop. Titled in Name of James Daniel Good*, 971 F.2d 1376, 1381 (9th Cir. 1992).

Claimants argue that the government first discovered Dr. Kivanc's general health care fraud in April 2005; thus, the limitations period expired before the complaint was filed in June 2011. The government contends that although it discovered Dr. Kivanc's overprescribing of controlled substances in April 2005, the Remicade health care fraud is a separate offense that the government discovered only in October 2006. The district court agreed with the government and denied Claimants' motion to dismiss.

Claimants characterize Dr. Kivanc's health care fraud as a single, continuing offense and cite *$515,060.42* in support of their argument. In *$515,060.42*, the Sixth Circuit concluded that a forfeiture action was time-barred because even though the government seized currency from relatively recent bingo operations, it had discovered the illegal gambling operation more than five years before filing the forfeiture action. 152 F.3d at 502-03. The court emphasized that the statute of limitations runs "from the date of '*discovery*' of an offense" and noted that the government "cannot disregard its discovery of earlier occurring offenses in preference for later offenses which would produce a more favorable timeline." *Id.* (emphasis in original).

But *$515,060.42* involved a single, continuing offense—the illegal operation of a gambling business—whereas here, Dr. Kivanc committed multiple, separate offenses. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 508-09 (7th Cir. 2010) (distinguishing *$515,060.42* because each incident of smuggling illegal cigars into the country constitutes a new, separate offense for Section 1621 purposes). When there is a continuing course of conduct with multiple, distinct underlying crimes that independently could support forfeiture of the same property, the limitations period starts

afresh with each new offense. *Id.* at 508. Thus, a court may adjudicate a forfeiture action as long as one underlying offense is not time-barred, even if the statute of limitations has run on the remaining offenses. *Id.*

The record in this case shows that Dr. Kivanc committed at least two separate offenses. *See id.* at 508-09.

Regarding the first offense, the government began investigating Dr. Kivanc in April 2005 after the Drug Enforcement Agency interviewed Dr. Kivanc's former patient Kimberly Maxwell. Maxwell alleged that Dr. Kivanc overprescribed controlled substances to her, including several pain medications such as hydrocodone, oxycodone, and methadose, without a medical exam and billed her insurance for services that she never received. Maxwell did not allege that Dr. Kivanc prescribed, administered, or billed her insurance for Remicade.

Regarding the second offense, the FBI became aware of the Remicade fraud on October 18, 2006, after Agent Weeter interviewed two of Dr. Kivanc's former employees who specifically mentioned the Remicade infusion scheme. Prior to that date, the FBI was investigating Dr. Kivanc's "illegal distribution of prescription drugs," but was not aware of "anything related to Remicade." J.A. 137.

We conclude that the Remicade health care fraud was a new "alleged offense" for purposes of Section 1621. *See id.* at 508. The fact that the government separately indicted Dr. Kivanc for each crime supports our conclusion: The government charged Dr. Kivanc with nineteen counts of distributing and conspiring to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846 in October 2010 and later, in April 2011, indicted Dr. Kivanc for the distinct crimes of twenty-three counts of health care fraud and conspiring to commit health care fraud under 18 U.S.C. §§ 1347 and 1349 based on the Remicade scheme. The government based its

civil forfeiture action not on Dr. Kivanc's overprescribing of controlled substances, but specifically on the Remicade health care fraud. Because the government filed its complaint in this case within five years of its discovery of the Remicade scheme in October 2006, the district court correctly denied Claimants' motion to dismiss based on the statute of limitations.

## B.

Claimants next argue that the district court erred by denying their motions to permit Turan and Dr. Kivanc to testify remotely from Turkey.

This Court reviews a district court's rulings regarding the presentation of evidence for abuse of discretion. *United States v. Ford*, 88 F.3d 1350, 1362 (4th Cir. 1996). The same standard applies to rulings regarding the use of remote testimony. *Palmer v. Valdez*, 560 F.3d 965, 968-69 (9th Cir. 2009); *Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005). Federal Rule of Civil Procedure 43 governs the taking of testimony at trial and states that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." Fed. R. Civ. P. 43(a).

Claimants argue that they showed good cause and compelling circumstances for Turan to testify remotely because of his poor health. Specifically, Claimants cite two letters from Turan's Turkish physician stating that Turan should not travel long distances due to his medical conditions, which include kidney stones, hypertension, and fainting. But the government provided an opposing letter from an American doctor who concluded that Turan's medical conditions did not prevent long-distance travel.

The magistrate judge reviewed the competing letters and heard arguments regarding the importance of Turan's testi-

mony. The magistrate judge then denied Claimants' motion to permit Turan's remote testimony, noting that "I don't see anything in this [case] that would lead me to believe that he cannot travel." J.A. 724-25. The district court affirmed that decision, concluding that the magistrate judge did not clearly err by weighing the benefit of live testimony against the dueling expert reports regarding Turan's health and any inconvenience of international travel. Given these facts, we cannot conclude that the district court abused its discretion by denying Claimants' motion to permit Turan to testify remotely.[2]

Claimants also contend that they showed good cause and compelling circumstances for Dr. Kivanc to testify remotely from Turkey. At the hearing on Claimants' motion, their attorney argued that even though the government subpoenaed Dr. Kivanc and indicted him on criminal charges, Dr. Kivanc was "unwilling to come back" to the United States but would testify remotely. J.A. 966. These facts do not amount to good cause or compelling circumstances to testify remotely. As the district court noted, allowing Dr. Kivanc to testify remotely under these circumstances would "make a mockery of our system of justice[.]" J.A. 966. Accordingly, we cannot conclude that the district court abused its discretion by denying Claimants' motion.

## C.

Claimants next argue that the district court erred by admit-

---

[2]Claimants also briefly assert that they showed good cause for Turan to testify remotely based on the cost of travel from Turkey to the United States. Yet Claimants did not raise this basis before the district court. It is therefore not preserved for our review. *See Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999). Even if it were preserved, there is no evidence that the cost of international travel would be a substantial burden on Turan. *Compare Lopez v. NTI, LLC*, 748 F. Supp. 2d 471, 480 (D. Md. 2010) (holding that it would impose a substantial inconvenience and cost to require individuals who make no more than $7,000 a year to travel from Honduras to the United States).

ting hearsay statements against Dr. Kivanc's interest and by prohibiting the admission of two documents under Rule 106. We will not overturn such evidentiary rulings absent an abuse of discretion. *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). And if an evidentiary ruling is found to be erroneous, we review the error for harmlessness. *Id.*; Fed. R. Civ. P. 61.

1.

We first consider whether the district court abused its discretion by admitting hearsay statements against Dr. Kivanc's interest.

Federal Rule of Evidence 802 generally prohibits the admission of out-of-court statements offered to prove the truth of the matters asserted. *See also* Fed. R. Evid. 801(c) (defining hearsay). Federal Rule of Evidence 804 lists several exceptions to Rule 802, including statements against interest, which are admissible if the declarant is unavailable as a witness. Fed. R. Evid. 804(b). A statement against interest is a statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Claimants recognize that Rule 804(b)(3)(B) requires corroborating circumstances only for statements "offered in a

criminal case[.]" Yet, Claimants still maintain that though this is a civil case, Dr. Kivanc's statements against interest must be corroborated and that the government failed to provide evidence of the trustworthiness of Dr. Kivanc's statements. As the Advisory Committee's Notes to Rule 804 explain, the rule does not address "the use of the corroborating circumstances for declarations against penal interest offered in civil cases." Fed. R. Evid. 804 advisory committee's notes, 2010 amendments. Nevertheless, at least one circuit court has applied Rule 804(b)(3)'s corroborating circumstances requirement in a civil case. *Am. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 541 (7th Cir. 1999). We need not decide this issue, however, because even if Rule 804(b)(3)(B)'s corroborating circumstances requirement were somehow to apply, the district court did not abuse its discretion by admitting the challenged statements.

We have identified several factors relevant in assessing the corroboration of a statement admitted under Rule 804(b)(3):

> (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

*United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995) (citations omitted).

Claimants challenge the following statements: (1) testimony by a former employee who overheard Dr. Kivanc refer to Remicade as "the money maker" during conversations with

Nguyen, J.A. 1207; (2) testimony by a former employee that Dr. Kivanc told her "there was an investigation going on" and directed her to lie to the FBI, J.A. 1220-21; (3) Nguyen's testimony about how he and Dr. Kivanc "doctored" documents to obtain Nguyen's medical assistant license, J.A. 1238; (4) Nguyen's statement that Dr. Kivanc told him Turan "was going to gather all of his [financial] records" following the government's request for Dr. Kivanc's business records, J.A. 1244; (5) Nguyen's testimony that Dr. Kivanc told him to "give the two [remaining] vials" of Remicade to a patient who was supposed to receive five vials, J.A. 1261-62; (6) Nguyen's testimony that Dr. Kivanc told him "not to write [patient notes] up like this anymore because . . . if this were to get into the wrong hands . . . they would know we were doing fraud," J.A. 1279; and (7) Nguyen's testimony that Dr. Kivanc said he was being persecuted and investigated, didn't know what he was going to do, and was "just going to try to get the house." J.A. 1288.

We first note that certain of the challenged statements are not hearsay. *See* Fed. R. Evid. 801(c); *see also United States v. Diaz*, 670 F.3d 332, 346 (1st Cir. 2012) (stating that "[o]ut-of-court statements providing directions from one individual to another do not constitute hearsay" when not offered to prove the truth of what was asserted). For the remaining statements, the following circumstances corroborate their trustworthiness: (1) Dr. Kivanc appears to have made each statement while at his medical office in the course of discussing work-related issues with his employees, and there was no apparent reason for Dr. Kivanc to lie to his employees; (2) several of the statements convey Dr. Kivanc's then-existing plans, *cf.* Fed. R. Evid. 803(3) (declarant's then-existing state of mind, such as motive, intent, or plan); and (3) Dr. Kivanc's statements expose him to criminal liability, *see United States v. Brainard*, 690 F.2d 1117, 1125 (4th Cir. 1982) (concluding that circumstances surrounding the declarant's statements provided the required corroboration in part because they tended to inculpate him).

Accordingly, the district court did not abuse its discretion by admitting Dr. Kivanc's statements.

2.

We next consider whether the district court abused its discretion by denying Claimants' request to admit two documents under Rule 106. Rule 106 of the Federal Rules of Evidence states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The purpose of Rule 106 is to permit the contemporaneous introduction of written or recorded statements "that place in context other writings [or recorded statements] admitted into evidence which, viewed alone, may be misleading." *United States v. Jamar*, 561 F.2d 1103, 1108 (4th Cir. 1977).

Claimants argue that the district court erred by prohibiting the admission of Dr. Kivanc's pretrial affidavit and letter to his attorney to "complete[ ] the record" and to mitigate "the prejudice created by the admitted hearsay statements." Appellant Br. at 33. Claimants' attempt to invoke Rule 106, however, must fail.

Rule 106 applies only to writings and recorded statements, not to conversations. Fed. R. Evid. 106, advisory committee notes; *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996). Here, Claimants sought the documents' introduction to refute witness testimony and conversations without reference to any specific document or recorded statement. And assuming for the sake of argument that Rule 106 applied to conversations and testimony, it would not apply here, when no introduced conversation was partially introduced or needed clarification. *See Wilkerson*, 84 F.3d at 696. Therefore, the district court did not abuse its discretion by denying Claimants' request.

## D.

With their next argument on appeal, Claimants contend that the district court erred by failing to give two of their proposed jury instructions.

This Court reviews a district court's jury instructions decision for an abuse of discretion. *United States v. Moye*, 454 F.3d 390, 398 (4th Cir. 2006) (en banc). A district court will be reversed for declining to give a proposed jury instruction only when the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (quotation marks omitted). In reviewing the adequacy of jury instructions, we determine "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.* (quotation marks omitted).

Claimants contend that the district court erred by failing to give the following proportionality instruction: "If the government proves that only a portion of the funds transferred to the claimants and used to purchase the property qualified as criminally derived property, then the forfeiture order may only forfeit that proportionate percentage of the property traced to the tainted proceeds." J.A. 926. Claimants appear to argue that even if Defendant Real Property is forfeitable, they are entitled to the portion of the sale proceeds that came from a legitimate source. The district court gave Claimants' requested instruction as applied to health care fraud, but denied it as applied to money laundering, noting that the proportionality rule doesn't apply to the government's theory of money laundering as a basis for forfeiture.

Under Section 981(a)(1)(A), any real or personal property "involved in" a money laundering transaction in violation of Section 1957 is subject to civil forfeiture. 18 U.S.C. 981(a)(1)(A). Consequently, when legitimate funds are commingled with property involved in money laundering or purchased with criminally derived proceeds, the entire property, including the legitimate funds, is subject to forfeiture. *See United States v. McGauley*, 279 F.3d 62, 76–77 (1st Cir. 2002) (stating that legitimate funds that are commingled with illegitimate funds can be forfeited if the commingling was done to conceal the illegitimate funds); *United States v. Baker*, 227 F.3d 955, 970 n. 4 (7th Cir. 2000) (same); *United States v. One Single Family Residence Located at 15603 85th Ave. N., Lake Park, Palm Beach Cnty., Fla.*, 933 F.2d 976, 981 (11th Cir. 1991) (stating that if one is a wrongdoer, "any amount of the invested proceeds traceable to drug activities forfeits the entire property"). Accordingly, Claimants' requested proportionality instruction was an incorrect statement of law as applied to money laundering, and the district court did not abuse its discretion by declining to give it. *See Noel*, 641 F.3d at 587.

Claimants also argue that the district court abused its discretion by instructing the jury on what Claimants characterize as the government's theory of the case,[3] while refusing to give Claimants' proposed theory of the case instruction. Claimants requested a three-paragraph-long theory of the case instruction, which included their proposed proportionality instruction, outlined their position on several factual issues in the case, and concluded by stating that "the [g]overnment has not met its burden on tracing the [Defendant Bank Account] funds." J.A. 938.

---

[3]When instructing the jury on the definition of proceeds, the district court gave the following instruction which Claimants characterize as the government's theory of the case: "In this case[,] the [g]overnment alleges that money that Dr. Kivanc fraudulently obtained from healthcare benefit programs are the proceeds of healthcare fraud." J.A. 1742.

Not only did Claimants' lengthy proposed theory of the case instruction contain an incorrect statement of law, it was also likely to mislead or confuse the jury to the prejudice of the government. Indeed, it would surely have been reversible error, had the district court instructed the jury that "the [g]overnment has not met its burden" in the case. J.A. 938. Clearly, the district court did not abuse its discretion in declining to give the proposed instruction.

E.

With their last argument on appeal, Claimants contend that the district court erred by denying their Rule 50 motion for judgment as a matter of law because the government failed to offer sufficient evidence of Dr. Kivanc's health care fraud and money laundering.

We review a district court's ruling on a motion for judgment as a matter of law de novo. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). We consider the evidence in the light most favorable to the nonmoving party but may not make credibility determinations or substitute our judgment for that of the jury. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1249 (4th Cir. 1996).

Claimants first argue that the government failed to prove by a preponderance of the evidence that Dr. Kivanc committed or conspired to commit health care fraud. A person commits health care fraud by

> knowingly and willfully execut[ing], or attempt[ing] to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program . . . .

18 U.S.C. § 1347.

Claimants contend that with the exception of co-conspirator Nguyen's testimony, the government failed to prove that Dr. Kivanc knowingly and willfully committed or conspired to commit health care fraud. But, as Claimants recognize, Nguyen testified extensively about how he and Dr. Kivanc implemented several methods to fraudulently bill Dr. Kivanc's patients' health care benefit programs for Remicade infusions. Further, Seres testified that 60% of Dr. Kivanc's Remicade billing was for Remicade supply that he did not possess. Accordingly, the government presented sufficient evidence to establish that Dr. Kivanc knowingly and willfully committed and conspired to commit health care fraud.

Finally, Claimants argue that the government failed to prove by a preponderance of the evidence that Dr. Kivanc intended to conceal his unlawful activities through money laundering. The elements of concealment money laundering are:

> (1) the defendant conducted or attempted to conduct a financial transaction having at least a *de minimis* effect on interstate commerce or involving the use of a financial institution which is engaged in, or the activities of which have at least a *de minimis* effect on, interstate commerce; (2) the property that was the subject of the transaction involved the proceeds of specified unlawful activity; (3) the defendant knew that the property involved represented the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity.

*United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998) (internal citation omitted); 18 U.S.C. § 1956(a)(1)(B)(i) and

(c)(4) (defining financial transaction as one which "in any way or degree affects interstate or foreign commerce"). To establish the fourth element of concealment money laundering, the government must prove a specific intent to conceal. *United States v. Villarini*, 238 F.3d 530, 533 (4th Cir. 2001). Claimants argue that the government failed to prove such intent. We disagree.

Nguyen testified that Dr. Kivanc said he was "going to try to get the house over to . . . his father's name" and that Dr. Kivanc said "F the [g]overnment, they're not going to get S from me." J.A. 1288. Seres explained that she traced $701,507 in fraudulent Remicade payments to Dr. Kivanc's Wachovia Business Account, the account from which he paid $665,588 in renovation and mortgage payments for Defendant Real Property and wrote four checks totaling $446,780 to Turan. Dr. Kivanc's statements and transfer of Defendant Real Property to Claimants and money to Turan are sufficient evidence of his intent to conceal his unlawful activities to withstand Claimants' Rule 50 motion. *See, e.g.*, *United States v. Shepard*, 396 F.3d 1116, 1122 (10th Cir. 2005) (stating that courts may infer intent to conceal when a defendant transfers unlawful proceeds into the control of a family member); *United States v. Miles*, 290 F.3d 1341, 1356 (11th Cir. 2002) (same).

## III.

In sum, we conclude that the district court did not err in its various rulings and, accordingly, we affirm.

*AFFIRMED*