**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 19-2173**

─────────

KEYES LAW FIRM, LLC,

        Plaintiff – Appellee,

    v.

NAPOLI BERN RIPKA SHKOLNIK, LLP; NAPOLI BERN, LLP; NAPOLI, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA, LLP; NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN, LLP; LAW OFFICES OF NAPOLI BERN RIPKA & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES LLP; NAPOLI, KAISER, BERN & ASSOCIATES, LLP; PASTERNACK TILKER NAPOLI BERN LLP; NAPOLI BERN RIPKA & ASSOCIATES, LLP,

        Defendants – Appellants,

    and

NAPOLI SHKOLNIK PLLC; NAPOLI SHKOLNIK & ASSOCIATES, PLLC; NAPOLI LAW PLLC; PAUL NAPOLI LAW PLLC; MARC J. BERN & PARTNERS LLP; MARC JAY BERN; PAUL J. NAPOLI,

        Defendants.

─────────

**No. 19-2174**

─────────

KEYES LAW FIRM, LLC,

        Plaintiff – Appellee,

    v.

PAUL J. NAPOLI; PAUL NAPOLI LAW PLLC; NAPOLI SHKOLNIK PLLC; NAPOLI LAW PLLC,

> Defendants – Appellants,

and

NAPOLI BERN RIPKA SHKOLNIK, LLP; NAPOLI BERN, LLP; NAPOLI, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA, LLP; NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN, LLP; LAW OFFICES OF NAPOLI BERN RIPKA & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES LLP; NAPOLI, KAISER, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA & ASSOCIATES, LLP; PASTERNACK TILKER NAPOLI BERN LLP; NAPOLI SHKOLNIK & ASSOCIATES, PLLC; MARC J. BERN & PARTNERS LLP; MARC JAY BERN,

> Defendants.

---

**No. 20-1067**

---

KEYES LAW FIRM, LLC,

> Plaintiff – Appellee,

v.

NAPOLI BERN RIPKA SHKOLNIK, LLP; NAPOLI BERN, LLP; NAPOLI, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA & ASSOCIATES, LLP; NAPOLI BERN RIPKA, LLP; NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN, LLP; LAW OFFICES OF NAPOLI BERN RIPKA & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN RIPA SHKOLNIK LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES LLP,

> Defendants – Appellants,

and

2

NAPOLI, KAISER, BERN & ASSOCIATES, LLP; PASTERNACK TILKER NAPOLI BERN LLP; NAPOLI SHKOLNIK PLLC; NAPOLI SHKOLNIK & ASSOCIATES, PLLC; NAPOLI LAW PLLC; PAUL NAPOLI LAW PLLC; MARC J. BERN & PARTNERS LLP; MARC JAY BERN; PAUL NAPOLI,

Defendants.

---

**No. 20-1070**

---

KEYES LAW FIRM, LLC,

Plaintiff – Appellee,

v.

PAUL NAPOLI; NAPOLI SHKOLNIK PLLC; NAPOLI SHKOLNIK & ASSOCIATES, PLLC; PAUL NAPOLI LAW PLLC; NAPOLI LAW PLLC,

Defendants – Appellants,

and

NAPOLI BERN RIPKA & ASSOCIATES, LLP; NAPOLI BERN, LLP; NAPOLI, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA, LLP; NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN, LLP; LAW OFFICES OF NAPOLI BERN RIPKA & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN RIPLA SHKOLNIK LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES LLP; NAPOLI, KAISER, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA & ASSOCIATES, LLP; PASTERNACK TILKER NAPOLI BERN LLP; MARC J. BERN & PARTNERS LLP; MARC JAY BERN,

Defendants.

---

**No. 20-2092**

---

KEYES LAW FIRM, LLC,

Plaintiff – Appellant,

3

v.

NAPOLI BERN RIPKA SHKOLNIK, LLP; NAPOLI BERN, LLP; NAPOLI, BERN & ASSOCIATES, LLP; NAPOLI BERN RIPKA, LLP; NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN, LLP; LAW OFFICES OF NAPOLI BERN RIPKA & ASSOCIATES, LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK LLP; LAW OFFICES OF NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES LLP; NAPOLI, KAISER, BERN & ASSOCIATES, LLP; PASTERNACK TILKER NAPOLI BERN LLP; NAPOLI BERN RIPKA & ASSOCIATES, LLP; NAPOLI SHKOLNIK PLLC; NAPOLI SHKOLNIK & ASSOCIATES, PLLC; NAPOLI LAW PLLC; PAUL NAPOLI LAW PLLC; MARC J. BERN & PARTNERS LLP; PAUL J. NAPOLI,

Defendants – Appellees,

and

MARC JAY BERN,

Defendant.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge.  (1:17-cv-02972-RDB)

---

Argued:  January 25, 2022                          Decided:  August 4, 2022

---

Before KING and RUSHING, Circuit Judges, and David J. NOVAK, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by unpublished opinion.  Judge Rushing wrote the opinion, in which Judge King and Judge Novak joined.

---

**ARGUED:**  William H. Hurd, TROUTMAN PEPPER HAMILTON SANDERS, LLP, Richmond, Virginia; Harold Mark Walter, OFFIT KURMAN, PA, Baltimore, Maryland, for Appellants/Cross-Appellees.  Jean Evelyn Lewis, David Jonathan Shuster, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellee/Cross-Appellant.  **ON BRIEF:** William Herbert Pillsbury, LAW OFFICES OF WILLIAM H. PILLSBURY, PLLC,

4

Willow Grove, Pennsylvania; Siran S. Faulders, TROUTMAN PEPPER HAMILTON SANDERS, LLP, Richmond, Virginia; Meghan Katherine Finnerty, Timothy Cronin Lynch, Eric Josh Pelletier, OFFIT KURMAN, PA, Baltimore, Maryland, for Appellants/Cross-Appellees.  Andrew Jay Graham, Louis Paul Malick, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellee/Cross-Appellant.

————————

Unpublished opinions are not binding precedent in this circuit.

RUSHING, Circuit Judge:

This case stems from a fee-splitting dispute between law firms. Following a nine-day trial about how much money was owed to Keyes Law Firm, LLC (KLF) under its association agreements with Napoli Bern Ripka Shkolnik, LLP (NBRS), the jury returned a verdict in favor of KLF. Now, on appeal and cross-appeal, the parties raise twenty-four issues claiming almost limitless error in the district court's pretrial, trial, and posttrial rulings. We have reviewed the record in these consolidated appeals and find no reversible error, with one small exception: application of Maryland's 10 percent postjudgment interest rate to the award of discovery sanctions. We accordingly vacate the district court's imposition of that rate and remand with instructions to apply the federal rate of postjudgment interest. On all remaining issues, we affirm.

I.

KLF is a Maryland-based law firm that represents asbestos plaintiffs; nonparty Mary Keyes is its founder and principal. On the other side of this dispute are Paul Napoli, an individual lawyer and citizen of New York; NBRS, a now-inactive New York law firm; and two groups of other defendants—the so-called Legacy Defendants[1] and Napoli Firm

---

[1] The Legacy Defendants are eleven law firm entities: (1) Napoli Bern, LLP; (2) Napoli, Bern & Associates, LLP; (3) Napoli Bern Ripka, LLP; (4) Napoli Bern Ripka Shkolnik & Associates, LLP; (5) Law Offices of Napoli Bern, LLP; (6) Law Offices of Napoli Bern Ripka & Associates, LLP; (7) Law Offices of Napoli Bern Ripka Shkolnik LLP; (8) Law Offices of Napoli Bern Ripka Shkolnik & Associates LLP; (9) Napoli, Kaiser, Bern & Associates, LLP; (10) Napoli Bern Ripka & Associates, LLP; and (11) Pasternack Tilker Napoli Bern LLP. The Legacy Defendants and NBRS filed joint appellate briefs.

Defendants[2]—comprising fifteen law firm entities. Napoli, along with nonparty Marc Bern, is the one-half equal owner of NBRS and the eleven Legacy Defendants. Napoli also owns and is the sole member of Paul Napoli Law PLLC, one of the four Napoli Firm Defendants. The other three Napoli Firm Defendants are purportedly owned by Napoli's wife, Marie Kaiser Napoli, a plaintiff's attorney in her own right.

The asbestos cases underlying this fee dispute originated with yet another law firm, the David Law Firm (DLF).[3] For years, DLF represented asbestos plaintiffs in the bankruptcy trust system, managing their claims against bankrupt asbestos defendants. DLF referred clients with claims against solvent defendants to KLF. As DLF's volume of referrals increased, KLF decided to partner with NBRS, a larger firm touting a national mass-tort practice, to handle the legal work. In 2012, KLF, acting as a middleman of sorts, began to re-refer cases from DLF to NBRS while retaining the right to share in the contingency fees.

Over the next several years, KLF and NBRS entered into 2,174 association agreements, corresponding with 2,174 separately referred asbestos clients. The written agreements memorialized the parties' understanding of their contractual relationship and the fee-sharing arrangement they negotiated at the outset. As part of that arrangement,

---

[2] The Napoli Firm Defendants are four law firm entities: (1) Paul Napoli Law, PLLC; (2) Napoli Shkolnik, PLLC; (3) Napoli Shkolnik & Associates, PLLC; and (4) Napoli Law, PLLC. The Napoli Firm Defendants filed their appellate briefs jointly with Paul Napoli.

[3] The David Law Firm is currently known as Cooper, Hart, Leggiero & Whitehead, PLLC. This opinion refers to the firm as DLF, as it was known to the parties during the relevant timeframe. DLF is not a party to this lawsuit.

DLF, KLF, and NBRS would each receive a share of the gross amounts recovered on behalf of their clients; in all but eleven of the 2,174 cases, the three firms' shares were fixed at 10 percent to DLF, 6 percent to KLF, and 24 percent to NBRS. As the firm doing most of the legwork, NBRS was entitled to the largest portion of each client's recovery but was also responsible for the costs associated with the claims.

In addition to the fee-sharing terms, the 2,174 association agreements set out other of the parties' rights and obligations, and not always in uniform fashion. For example, some agreements read, "My firm reserves the right to have access to client files and any accounting records pertaining to shared clients." J.A. 114. Other agreements included no such provision. Some agreements specified exactly when payment was due to KLF, while several did not. All of the agreements, however, included language requiring NBRS to disburse a single payment to KLF with an amount representing both KLF's and DLF's portions of the gross recovery for that client. KLF would then remit the funds representing DLF's share to DLF, which was not itself a party to the association agreements.

In late 2014, NBRS's two owners, Napoli and Bern, had a falling out and decided to part ways. Amid litigation between the former partners, NBRS was placed in receivership. In 2015, with the approval of NBRS's court-appointed receiver, Napoli and Bern reached a settlement agreement in which they agreed to divide NBRS's caseload. Relevant here, all 2,174 of the KLF-referred asbestos clients were "allocated" to Napoli and his new law firm, Paul Napoli Law PLLC. J.A. 5302. When Napoli eventually joined the practices of the other Napoli Firm Defendants, the asbestos cases went with him as the

8

"attorney in charge." J.A. 4109. NBRS, which stopped performing legal services after the Napoli–Bern split, remains in receivership to this day.

For a time after NBRS's breakup, KLF continued to receive its share of the recoveries in some of the asbestos cases that had settled or resulted in a favorable verdict. In 2016, however, Keyes noticed that payments to KLF had dwindled and eventually discontinued. Despite repeated requests for information from Napoli, who remained KLF's point of contact, Keyes was denied any updates about the cases and any accounting of the amounts recovered. In October 2017, KLF sued the seventeen defendants currently involved in this appeal, among other defendants that have since been dismissed, claiming breach of the association agreements and seeking payments still owed.

## II.

Taking in roughly chronological order the numerous district court rulings the parties challenge on appeal, we begin with the district court's order imposing discovery sanctions against the defendants.[4] The bickering over discovery in this case required repeated judicial intervention. The parties' principal dispute stemmed from the defendants' continuing failure to "fully" comply with the district court's orders in February and April 2019 "to provide the discovery documents that account for the funds" recovered under the 2,174 association agreements. J.A. 350. In ruling that the defendants must comply or "show cause why they should not be found in contempt," the district court observed that

---

[4] The defendants maintain, and KLF does not dispute, that Napoli Shkolnik & Associates, PLLC is not subject to the district court's sanctions order because it was not a party to the lawsuit at the time. *See* J.A. 666 (specifying the defendants held jointly and severally liable for the award).

9

law firms "are ethically bound to account for funds received on behalf of their clients, and practically speaking, they must account for receipts and distributions from client accounts." J.A. 350. When the defendants did not fulfill their obligation to produce an accounting of the amounts recovered in the asbestos cases, a show-cause hearing was held on May 9, 2019.

At the hearing, the district court declined to find the defendants in contempt. However, the court concluded that it would award KLF "unnecessary costs and expenses" arising from the defendants' continuing failure to fulfill their discovery obligations. J.A. 414. The court found "troublesome" that the defendants supposedly did not have records showing the gross recoveries for the 2,174 asbestos clients and expressed skepticism "that this accounting is as chaotic . . . as it appears." J.A. 400. The court directed KLF to submit a fee application detailing the time "spent going through the files, requests, telephone calls, [and] emails back and forth," recognizing "all that [as] reasonable time being expended trying to battle through on discovery." J.A. 431.

Shortly after the hearing, KLF filed its fee application seeking $211,156.50 in fees and $131,080.87 in expenses, which the defendants contested. In response, KLF agreed to reduce its initial request by $25,364.25 to exclude fees for some expert preparation, as well as all fees incurred before discovery requests were served. In September 2019, the district court granted KLF's revised fee application, confirming that "for the reasons previously set forth on the record at the May 9, 2019 hearing," it had found "good cause" to impose discovery sanctions against the defendants. J.A. 665. The order also concluded that "[f]or the reasons stated in [KLF's] Fee Application (ECF#192) this Court finds that 10 of 12

10

*Johnson Factors* [sic] . . . are satisfied and weigh overwhelmingly in favor of the Plaintiff." J.A. 665.[5]  The court awarded KLF $316,873.12 in attorneys' fees and expenses, plus postjudgment interest of 10 percent annually in accordance with Maryland law.

On appeal, the defendants advance three core arguments against the district court's sanctions order.  They claim (1) the sanctions as a whole, or certain parts of the award, are not justified; (2) the district court did not provide sufficient explanation for its decision to impose sanctions or its calculation of the sanctions award; and (3) the district court erred in imposing Maryland's 10 percent interest rate instead of the federal rate required by 28 U.S.C. § 1961.

"We review the imposition of discovery sanctions for abuse of discretion." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011).  "In doing so, we are mindful of the broad discretion accorded to district courts to supervise discovery . . . as part of their case-management authority." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014).  Our review of a court's award of attorneys' fees "is sharply circumscribed, and a fee award must not be overturned unless it is clearly wrong." *Berry v. Schulman*, 807 F.3d 600, 617 (4th Cir. 2015) (internal quotation marks omitted).

We discern no abuse of discretion in the district court's imposition of discovery sanctions, its explanation for doing so, or its selection of the fee award.  As it explained at the show-cause hearing, the court concluded that the defendants' "eleventh-hour

---

[5] The twelve fee-shifting factors of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), are used to determine reasonable attorneys' fees. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (adopting the *Johnson* factors).

11

production[s]" and persistent failure to turn over documents central to KLF's claims violated its orders and justified sanctions. J.A. 423. The court's award was "backed by substantial evidence on which the court was entitled to rely," *Berry*, 807 F.3d at 618, and its incorporation of the reasoning contained in KLF's fee application does not itself constitute reversible error. *See Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985); *EEOC v. Fed. Rsrv. Bank of Richmond*, 698 F.2d 633, 641 (4th Cir. 1983), *rev'd on other grounds sub nom. Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867 (1984).

Regarding the interest rate, however, the parties do not seriously contest that "[f]ederal law, rather than state law, governs the calculation of post-judgment interest in diversity cases" like this one. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999); *see* 28 U.S.C. § 1961(a) (providing that interest "on any money judgment in a civil case recovered in a district court" shall be calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding[] the date of the judgment").[6] We agree and therefore remand to the district court with instructions to calculate the proper rate of postjudgment interest on the fee award consistent with 28 U.S.C. § 1961. In all other respects, we affirm the district court's sanctions order.

---

[6] It is true, as KLF points out, that the defendants did not contest application of the Maryland rate before the district court, which would ordinarily forfeit the defendants' argument for appeal. In unpublished authority, however, a panel of this Court reasoned that, because "[t]he award and rate of interest under 28 U.S.C. § 1961(a) is mandatory, . . . Plaintiffs' argument that Defendants waived the application of the federal rate by not previously contesting the use of the higher [state] rate is unpersuasive." *Vandevender v. Blue Ridge of Raleigh, LLC*, 756 Fed. App. 230, 233 (4th Cir. 2018). KLF does not offer any reason for us to contradict *Vandevender* in this similarly unpublished decision, and we decline to plumb the issue independently.

III.

We turn next to the district court's rulings on summary judgment, which have produced a half-dozen challenges on appeal by various defendants. All parties moved for summary judgment; the defendants also moved under Federal Rule of Civil Procedure 53 for the appointment of a special master to render an accounting of the asbestos cases. In December 2019, the district court denied the defendants' motions but granted in part and denied in part KLF's cross-motion for summary judgment.

A.

All defendants moved to dismiss the complaint for lack of personal jurisdiction and renewed their jurisdictional challenges in subsequent summary judgment motions. The district court deferred ruling on the Legacy Defendants and Napoli Firm Defendants until after trial, finding "disputed material jurisdictional facts" on the extent of their connection to Napoli and the association agreements. J.A. 5343. But the district court held that KLF had established personal jurisdiction in Maryland over NBRS and Napoli by a preponderance of the evidence at summary judgment.

As the district court explained, NBRS negotiated and signed all 2,174 agreements associating itself with KLF, a Maryland entity. NBRS negotiated those agreements through email and phone communications into the State and an in-person visit by the firm's principals. "In addition, the association agreements provided for contingency fee payments to [KLF]" and required NBRS to handle the claims of the asbestos clients "in the jurisdictions applicable to each claim, including some forty claims in Maryland." J.A. 5340–5341. To that end, NBRS "operated law offices or otherwise employed attorneys in

13

. . . Maryland during the events at issue." J.A. 162. This degree of Maryland contacts, the district court concluded, was sufficient for NBRS to "'reasonably anticipate being haled into court there.'" J.A. 5341 (quoting *English & Smith v. Metzger*, 901 F.2d 36, 40 (4th Cir. 1990)). As for Napoli, the court acknowledged that his status as a partner at NBRS was not sufficient by itself to confer jurisdiction over him. But Napoli had "established a personal contact" with the forum "through his pursuit of the association agreements." J.A. 5342. As the district court recounted, Napoli himself called and emailed KLF regularly and traveled to Baltimore at least once to discuss business with Keyes. He also sent payments to KLF in Maryland and requested KLF's assistance on specific asbestos cases, some of which were being litigated in the State. Taken together, the court concluded, Napoli's individual contacts with Maryland were likewise sufficient to establish specific jurisdiction.

NBRS and Napoli contest the district court's jurisdictional rulings, arguing that their contractual relationship with KLF did not implicate enough Maryland contacts. The two defendants reject the district court's finding that Napoli, as opposed to Keyes, initiated the parties' relationship and observe that much of the business occurred in New York, where the association agreements were signed and NBRS was headquartered. Napoli further insists that, because he was merely acting as NBRS's intermediary, he was not personally availing himself of the privilege of conducting activities in Maryland.

We review jurisdictional questions de novo, assessing the defendants' arguments through the lens of our three-part test for specific jurisdiction, under which a plaintiff must show (1) the defendants "purposely availed" themselves of the forum state by engaging in

14

activities there, (2) the plaintiff's claims arose from those activities, and (3) jurisdiction is "constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (internal quotation marks omitted). We bear in mind that where, as here, "full discovery had been conducted and the relevant evidence on jurisdiction had been presented," a plaintiff must prove jurisdictional facts "by a preponderance of the evidence." *Grayson v. Anderson*, 816 F.3d 262, 269 (4th Cir. 2016). We evaluate a district court's "underlying factual findings for clear error." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

We see no reversible error in the district court's exercise of specific jurisdiction over NBRS or Napoli. Relying on circuit precedent, the court appropriately determined that NBRS's and Napoli's "intentional contacts" with Maryland—the same contacts giving rise to KLF's lawsuit—were sufficient to create specific jurisdiction. *English & Smith*, 901 F.2d at 40. Those contacts included the pursuit and execution of a business relationship with KLF, NBRS's operation of a Maryland office to handle the asbestos cases there, Napoli's in-state visit, regular email and phone communications, the transmittal of payments to KLF, and the defendants' otherwise "continuing relationship with [KLF] in [Maryland]" while the parties worked on the asbestos cases. *Id.*; *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 479–480 (1985). The fact that Napoli was, in some respects, acting on NBRS's behalf did not alter the court's jurisdictional analysis, since Napoli's association with KLF went beyond his role at NBRS and, indeed, beyond NBRS itself; as the district court recognized, "all 2,174 [association agreements] went to Mr. Napoli" after NBRS's split. J.A. 5343 (internal quotation marks omitted); *see Columbia Briargate Co.*

15

*v. First Nat'l Bank in Dallas*, 713 F.2d 1052, 1055–1058 (4th Cir. 1983) (rejecting the "fiduciary shield doctrine" and clarifying that "the controlling issue is simply whether the non-resident defendant, whatever role he may have occupied [at the company], had such 'minimum contacts'"). We therefore affirm the court's exercise of specific personal jurisdiction over both NBRS and Napoli.

B.

The district court also ruled on summary judgment that Napoli was assigned the association agreements after NBRS's 2015 split, making him liable for any breach of those agreements by NBRS.[7] Specifically, the court found it "undisputed," J.A. 5349, that the Napoli–Bern settlement agreement had "allocated" the entire asbestos docket to Napoli, J.A. 5302. *See also* J.A. 5186 (Bern Dep.); J.A. 4020 (Haines Dep.). "[T]hereafter," Napoli "continued to litigate the [asbestos clients'] claims" and even "acknowledged payments to Plaintiff," assuming, in the process, the duties of the agreements—e.g., representation of the asbestos clients and contingency fee payments to KLF—as well as the contractual rights. J.A. 5349–5350. Under New York law, these actions by Napoli went beyond "'mere participation or support in the performance of a contract'" and constituted "'affirmative assumption'" of the agreements. J.A. 5349 (quoting *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 494–495 (S.D.N.Y. 2011)). Moreover, the court determined, "Napoli was assigned the association agreements individually" and remained

---

[7] The district court alternatively held that Napoli was NBRS's alter ego, but we need not reach that alternative holding because we affirm the court's conclusion that Napoli was assigned the association agreements under New York law.

16

responsible for them, even after the other Napoli Firm Defendants became involved. J.A. 5348. On appeal, Napoli reprises his contentions to the contrary.

We find no reversible error in the district court's decision, which we review de novo. *See Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). The Napoli–Bern settlement agreement—executed by Napoli in his individual capacity and binding on Napoli's own "successors, assigns, and representatives," J.A. 5290—transferred the asbestos docket to Napoli, who completed that assignment by taking affirmative action to assume NBRS's obligations under the agreements, and no reasonable jury could find to the contrary. *See In re Refco Inc.*, 826 F. Supp. 2d at 494; *see also BSI-Banca Della Svizzera Italiana v. Ensra Constr. Corp.*, 194 A.D.2d 403, 403–404 (N.Y. App. Div. 1993) ("[A] finding of affirmative action . . . [is] sufficient to demonstrate [a party's] intent to assume its assignor's obligations under the contract[.]"); *Matter of Kaufman*, 272 A.D. 578, 581–582 (N.Y. App. Div. 1947). The district court further recognized that even Napoli's own expert, Ronald Minkoff, agreed that Napoli had assumed the duties of the association agreements, insofar as he continued to represent the asbestos clients after joining the Napoli Firm Defendants.

## C.

After resolving that Napoli was the assignee of NBRS's association agreements with KLF, the district court granted partial summary judgment for KLF, holding that NBRS (and thus Napoli) breached the agreements by "fail[ing] to provide a complete and accurate accounting to Plaintiff of the fees owed to KLF." J.A. 5353. The court further observed

17

that the evidence was undisputed that some amount of money was owed to KLF under the agreements.

In reaching its decision, the district court first rejected the argument that each of the 2,174 association agreements should be evaluated separately to prove 2,174 separate breaches. As the court explained, "NBRS and Mr. Napoli's breach lies in their failure to provide a complete accounting to Plaintiff on the 2,174 association agreements at issue." J.A. 5353. In its written order, the court reasoned that all of the association agreements expressly or impliedly incorporated the professional obligation to "'maintain complete records of all funds'" belonging to "'a client or third person'" and to "'render appropriate accounts to the client or third person regarding'" those funds. J.A. 5353 (quoting N.Y. Rules of Prof'l Conduct 1.15(c)(3)). The "undisputed" fact that NBRS and Napoli did not do either of these things thus constituted a violation of the agreements. J.A. 5353. In addition, as the court remarked at the November 25, 2019 motions hearing, contingent fee agreements between law firms "necessarily . . . include[] a general principle of accounting." J.A. 5716. To suggest that a payment "would not be accompanied by some type of an accounting," J.A. 5714, not only defies common sense but "require[s] total ignorance of how the practice of law is conducted in terms of referrals," J.A. 5719. Moreover, drawing on its inherent "case management" authority, the court refused to "break this case down to 2,174 pieces." J.A. 5702. To the contrary, collective treatment was appropriate due to NBRS's and Napoli's own inability or refusal to "crunch[] the numbers" in a way that would permit the court to determine what had been paid and what was still owed under each agreement. J.A. 5808. For these reasons, while "the question

18

of exactly what is owed" remained "a matter that the jury is going to have to resolve," the court granted partial relief to KLF by finding NBRS and Napoli liable under all 2,174 of the association agreements.  J.A. 5706–5707.

On appeal, NBRS and Napoli criticize the district court's decision to treat the 2,174 agreements in the aggregate and dispute the court's theory of an accounting breach.  The two defendants additionally maintain that they did, in fact, provide all the necessary data for KLF to render an accounting of the asbestos cases, thus precluding summary judgment. The data provided, the defendants say, were in thirteen boxes of documents "attached" to their motions for summary judgment filed on October 11, 2019—two weeks after the close of discovery and less than eight weeks before trial.

We identify no reversible error in the district court's rejection of these arguments. The court appropriately reasoned that trial management concerns, the defendants' own accounting failures, and the nature of the parties' arrangement favored treating the agreements collectively.[8]  Nor did the court err in concluding that the parties understood

---

[8]  The parties debate which standard of review governs the district court's decision to treat the 2,174 agreements collectively.  KLF requests abuse of discretion on the theory that the court's decision derived from its case management authority, while NBRS and Napoli insist that de novo review applies because whether multiple writings should be construed as one agreement is a question of contract interpretation.  We need not resolve this debate, however, since under either standard of review—and under either theory of the court's decisionmaking authority—we affirm the district court's reasonable approach.  *See United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("The scope of the district court's discretion to manage trials before it is . . . particularly broad."); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (explaining that whether a series of contracts should be construed as one agreement depends upon the parties' intent viewed in light of surrounding circumstances, including "drafting history and chronology, the cross-referencing of the agreements, the integral nature of the undertakings," the relationship between the parties, and "the background assumptions").

19

NBRS and Napoli would keep an accurate accounting of their clients' funds and the funds of third parties like KLF. *See Wieder v. Skala*, 609 N.E.2d 105, 108–111 (N.Y. 1992); *see also Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985) ("Implied contractual obligations may coexist with express provisions . . . where common expectations or the relationship of the parties as structured by the contract so dictate."). Similarly, the court's refusal to accept the defendants' thirteen boxes of documents as "constitut[ing] an accounting as required under the association agreements" was not erroneous, especially as the defendants' own expert, Dr. Emre Carr, admitted that the records were incomplete in the accounting they supposedly provided. J.A. 5353. We therefore sustain the district court's grant of partial summary judgment to KLF.

D.

The defendants also complain that the district court denied their Rule 53 motion to appoint a special master to perform an accounting of the 2,174 asbestos cases. In its written order and at the motions hearing, the court explained that it found the defendants' request "way late in the game." J.A. 5687. Observing that trial was only a couple of weeks away, the court remarked that "appointing a special master would have been a great thing to do a year ago," J.A. 5781, but "it's too late" now, J.A. 5777. Invoking its authority under Federal Rule of Evidence 611, which allows for "reasonable control" of trial procedures to "avoid wasting time" or for any similar reason, Fed. R. Evid. 611(a), the district court declined to "pull[] this case" off of the trial calendar and "hav[e] a special master come in" at this juncture, J.A. 5778.

20

We review the district court's decision under a deferential abuse of discretion standard, *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018); *Meeropol v. Meese*, 790 F.2d 942, 961 (D.C. Cir. 1986), and find it amply justified given the tardiness of the defendants' motion. We accordingly affirm the district court's denial of the defendants' Rule 53 request for a special master.

## IV.

We next take up the defendants' challenges to a series of evidentiary rulings by the district court. The reversal of any of these rulings, the defendants say, would warrant a new trial. But for the reasons that follow, we find no reversible error in the district court's evidentiary rulings or related decisions.

## A.

We begin with the district court's decision to permit testimony by KLF's expert, Martin Himeles, on attorney ethics. Himeles offered four opinions, each of which the defendants resist. First, Himeles testified that "certain of the Legacy and Napoli [Firm] Defendants charged expenses that were excessive and that were not related to the matters for which they were engaged." J.A. 1818. Second, he stated that "expenses incurred in connection with handling the [asbestos clients'] claims[] do not affect the net amounts due and owing to [KLF]." J.A. 1824. Third, he opined that the defendants "had a fiduciary duty to [KLF] with respect to funds they received that belonged to [KLF]," J.A. 1830, which included the duty to "maintain[] records of those funds," J.A. 1836. Finally, Himeles maintained that the "Legacy Defendants conducted themselves as if they were a single entity," the "Napoli [Firm] Defendants did the same thing," and the "Napoli [Firm]

21

Defendants conducted themselves and operated themselves as if they were a successor to the Legacy Defendants, all of which was done in a way that is not consistent with the custom and practice in the legal industry." J.A. 1839.

Invoking Federal Rule of Evidence 404, the defendants now assert that Himeles's attorney-ethics testimony was offered solely to convince the jury that Napoli, and all other defendants by association, were unethical and deserving of punishment. The defendants further insist that the district court exacerbated its error by commenting on the testimony's importance to the jury.

We review the admission of evidence for an abuse of discretion, *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011), and we find no such abuse here. As the district court recognized, "the issue of how Defendants handled [client] expenses was raised by Defendants themselves as [an] affirmative defense[]," so it was appropriate for Himeles to opine on the reasonableness of those expenses and whether they should be deducted from KLF's total recovery. J.A. 5577–5578. "Moreover," Himeles's opinions were "directly relevant to [KLF's] assertion of alter ego liability" for the Legacy Defendants and Napoli Firm Defendants.[9] J.A. 5577. The court's remark to the jury that Himeles's testimony was "very important" to the alter-ego instruction, J.A. 1807, was within its "broad discretion"

---

[9] Among the factors commonly considered in deciding alter-ego status are the "siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness." *Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998); *accord MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001); *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 603 A.2d 1301, 1318–1319 (Md. Ct. App. 1992). As the district court recognized, Himeles opined on all of this.

22

to "comment" on evidence "in order to assist the jury in understanding the facts and issues in dispute," *United States v. Lefsih*, 867 F.3d 459, 467 (4th Cir. 2017) (internal quotation marks omitted). In short, even if Himeles's testimony had some prejudicial effect, the district court determined it did not "*substantially* outweigh[]" the testimony's probative value. *Morgan v. Foretich*, 846 F.2d 941, 944 (4th Cir. 1988). We see no reversible error in this determination.

## B.

The next question before us is whether the district court erred in its rulings regarding the admission and use at trial of spreadsheets produced by the defendants on December 4, 2019. Before addressing the defendants' various assertions on this score, some factual background is necessary.

## 1.

Over the course of a one-year discovery period, and despite two court orders to do so, the defendants repeatedly failed to produce full and accurate information regarding settlement status and amounts for the 2,174 asbestos cases that KLF had referred under the association agreements. In September 2019, the district court sanctioned the defendants for this violation, expressing skepticism that their recordkeeping was really so chaotic that they could not provide a full accounting. *See supra*, at 9–12. Eventually, on October 11, 2019—two weeks after discovery had ended and less than two months before trial—the defendants submitted thirteen boxes of records, including some records that had not previously been produced, as part of their motions for summary judgment. But the records did not contain any overall, case-by-case accounting to the district court's satisfaction,

23

which the court noted at the November 25, 2019 motions hearing and in its later order on summary judgment. Finally, on December 4, 2019—five days before trial was to begin— the defendants produced three spreadsheets, including a spreadsheet that was "broken down by individual settlement" and "identif[ied] whether the settlement has been collected and the amounts KLF was paid." J.A. 961. However, the defendants never produced the native-file database from which the spreadsheets allegedly came.

The district court refused the defendants' attempts to introduce the late-breaking spreadsheets into evidence and present them to the jury as the accounting or compliance database that the defendants had supposedly maintained all along. The court did, however, permit Andrew Evans, one of KLF's experts, to present limited testimony about the "reliability and veracity" of the data in the spreadsheets. J.A. 1972. Evans concluded on direct examination that "the state of the data that the Defendants in this litigation have produced" was "still not comprehensive." J.A. 2049. On cross examination, the defendants sought to undermine Evans's reliability analyses. But after defense counsel asked several questions implying that Evans's conclusions were outdated because he deliberately neglected to review the December 4 spreadsheets thoroughly, the court provided an on-the-spot instruction to clarify for the jury that the defendants' production of new documents five days before trial was "not routine" and "not in compliance with Court orders." J.A. 2078. While "[i]t's perfectly appropriate for counsel to attack the accuracy of the data," "it is not accurate to suggest" that such belated productions are "routine," the court explained. J.A. 2078.

24

When it came to their affirmative case, the defendants sought to present testimony from Robert Gitelman, a former employee of NBRS and current lawyer at Napoli Shkolnik PLLC, about the December 4 spreadsheets. KLF objected, noting that Gitelman had not been identified as a witness under Federal Rule of Civil Procedure 26(a), much less as one with knowledge about the spreadsheets. The court sustained KLF's objection, although it permitted Gitelman to explain how data relating to client settlements were recorded at NBRS and Napoli Shkolnik PLLC. The court likewise refused to permit Napoli to reference the December 4 spreadsheets in his testimony, although it allowed him to testify about the data discrepancies identified by Evans, what he believed the defendants had already paid to KLF, and what they still owed. The defendants also called Dr. Emre Carr, an accountant, to provide expert testimony on the defendants' data. Carr opined at length "that the Defendants' data are accurate" and that Evans's "opinions are flawed and also mathematically biased to . . . inflate total settlements." J.A. 2853. Although Carr did not rely on the December 4 spreadsheets in his testimony, he responded to Evans's conclusions regarding the reliability of those data.

During closing argument, defense counsel criticized Evans's reliability analyses, explaining in particular that "he was comparing . . . old data from the Defendants to new data [from the asbestos defendants] about the settlements" to "create the appearance of errors where there are no errors." J.A. 3098–3100. In response, KLF's counsel highlighted the absence of evidence, saying:

> Mr. Napoli went on and on, his lawyers went on and on about this database. Right? They went on and on about how meticulous it is. Does it cross anybody's mind: Why don't they show it to us? Why don't they produce it?

Why don't they put it on one of these screens and walk us through this perfect database? Why don't they do that? They have never done that in this case.

J.A. 3129.

In submitting the case to the jury, the district court issued the following instruction:

If you find that the defendants could have produced the evidence, and that the evidence was within his or her control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been unfavorable to the defendants.

J.A. 3286. The instruction clarified, however, that the jury "may also consider whether the defendants had a reason for not producing this evidence that was explained to your satisfaction." J.A. 3286.

2.

On appeal, the defendants challenge every purported misstep they perceive the district court committed in this sequence of events. Their arguments can be grouped into three claims of error.

First, the defendants assert that the district court abused its discretion by refusing to admit the December 4 spreadsheets into evidence and by barring the defense witnesses from discussing them, despite allowing KLF's expert Evans to opine on the data. This error was aggravated, the defendants argue, by the court's instruction that the defendants' eleventh-hour production of evidence was "not routine."

We find no abuse of discretion in the court's decision to exclude the spreadsheets. "We give particularly wide latitude to the district court's discretion to issue sanctions under [Federal Rule of Civil Procedure] 37(c)," *S. States Rack & Fixture, Inc. v. Sherwin-*

26

*Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003) (internal quotation marks omitted), which permits a court to exclude evidence not disclosed during discovery "unless the failure [to disclose] was substantially justified or is harmless," Fed. R. Civ. P. 37(c)(1).  The district court here reasonably concluded that the defendants could offer no explanation for their failure to provide the spreadsheets until the cusp of trial.  It also found that KLF would be prejudiced by the admission of documents that its counsel and experts did not have time to adequately review before trial was scheduled to begin.  *See S. States Rack & Fixture*, 318 F.3d at 597 (listing the five factors evaluated under Rule 37(c)(1), including the "surprise to the party against whom the evidence would be offered," "the extent to which allowing the evidence would disrupt the trial," and "the nondisclosing party's explanation for its failure").  Moreover, contrary to the picture the defendants attempt to paint on appeal, the district court did not permit Evans to give freewheeling testimony about the December 4 spreadsheets while stripping the defendants of any opportunity to respond.  Rather, the court restricted Evans's opinions to whether the defendants' data on the whole was reliable—a point which the defendants amply challenged through cross-examination and the testimony of Carr, Gitelman, and Napoli.[10]  We decline to intrude on the district court's sound discretion in this regard.

---

[10] The defendants also insist that Gitelman was, in fact, a properly identified witness under Rule 26(a), but this argument is beside the point.  Regardless of any Rule 26 error, the district court permitted Gitelman to testify about the settlement collection and accounting processes at NBRS and Napoli Shkolnik.  It simply restrained him from rendering opinions about the December 4 spreadsheets.

Second, the defendants contend that the district court erred in denying their motion for a mistrial in response to KLF's remarks during closing. We similarly review this issue for abuse of discretion, *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 351 (4th Cir. 2014), and again find no abuse. As the court explained in its posttrial order, "any comment by Plaintiff's counsel in closing argument about the Defendant[s'] failure to produce a database . . . [was] not in error, as Defendants never submitted a native file database as requested during discovery, and their production of a spreadsheet containing settlement information just days before trial does not constitute the provision of a 'database.'" J.A. 5574. Given our "great deference for the superior vantage point of the trial judge and with a close eye to the particular context of th[is] trial," *Minter*, 762 F.3d at 351 (internal quotation marks omitted), we decline to upend the court's decision.

Finally, the defendants oppose the district court's instruction permitting the jury to draw an adverse inference from the absence of the database evidence. "[T]he trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). "Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that the party fears to produce the evidence." *Id.* (internal quotation marks and brackets omitted). Here, the defendants themselves claimed the existence of a highly relevant database that they never produced. The district court acted within its discretion in authorizing, but not requiring, the jury to draw an adverse inference from this course of events.

28

V.

The defendants also contest three other jury instructions, as well as the verdict form. The defendants again assert that reversal on any one of these issues merits a new trial, but we reject their arguments in toto and affirm for the reasons given below.

A.

The defendants first take issue with the district court's jury instruction on the law of alter egos. The challenged portion of the instruction reads as follows:

> Plaintiff also claims that the other law firm defendants are liable for the amounts owed to plaintiff because the other law firm defendants are alter egos of Paul J. Napoli, Napoli Bern Ripka Shkolnik LLP, and of each other.

J.A. 3298. The defendants contend that this instruction was misleading because it gave the jury three options for finding an alter ego: Napoli, NBRS, or "each other." This was erroneous, they say, because it allowed the Legacy Defendants and Napoli Firm Defendants to be found liable as alter egos of "each other" before it was first established that the "other" was indeed liable.[11]

Where, as here, a party challenges a jury instruction on the ground that it confused or misled the jury, we review the instruction for an abuse of discretion. *United States v.*

---

[11] The Legacy Defendants also contend that the alter-ego instruction was erroneous because it did not provide adequate instruction on the different theories of alter ego liability, such as reverse veil piercing. In the same breath, however, the Legacy Defendants concede that the controlling law for these other theories mirrors the standard for alter-ego liability that the instruction in fact provided. That concession defeats their argument. *See Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996) ("The test of adequacy of instructions is not one of technical accuracy in every detail, but is instead simply that practical one of whether the instructions construed as a whole, and in light of the whole

29

*Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013). No such abuse is evident here. When the alter-ego instruction is "construed as a whole, and in light of the whole record," *id.* (internal quotation marks omitted), the defendants offer little reason to assume that the jury would be confused about the basic liability issues at stake. At least from the perspective of the Legacy Defendants and Napoli Firm Defendants, the whole point of trial was to decide whether they should "share in the liability" of NBRS and Napoli, J.A. 3293—not whether they could "share in the liability" of firms that were not liable to begin with. The district court did not reversibly err in providing the alter-ego instruction.

B.

Second, the defendants volley multiple objections to the district court's instruction on the law of assignment. But we need not resolve these contentions. Every defendant that the jury found liable by way of assignment it also found liable under an alter-ego theory.[12] Thus, even assuming the assignment instruction was erroneous, any error was harmless given our earlier conclusion that the alter-ego instruction did not constitute an abuse of discretion. *See United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998) ("Application of the harmless-error analysis for erroneous instructions is also possible when the trial court submits a case to the jury on two or more alternate theories[.]").

---

record, adequately informed the jury of the controlling principles." (internal quotation marks and alterations omitted)).

[12] Of the fifteen total Legacy Defendants and Napoli Firm Defendants, thirteen were found liable by the jury. Of the thirteen liable defendants, all were found liable under the alter-ego theory, whereas twelve were found liable under the assignment theory.

30

C.

Third, the defendants claim the district court erred in its instruction regarding the burden of proof for damages.  In full, that instruction reads:

> When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, the burden of uncertainty as to the amount of damage is upon the wrongdoer.  In this case, the burden is on the defendants to establish that they have provided an accurate and complete accounting of the amounts collected on behalf of the subject clients.  If there is uncertainty to that amount, that uncertainty should be resolved against the defendants.  Plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach.

J.A. 3303.

On appeal, the defendants posit that New York law does not support a so-called "wrongdoer instruction" in this case because KLF did not seek prospective damages or lost profits.  The Legacy Defendants and Napoli Firm Defendants further complain that the instruction lumped them together with the other defendants as "wrongdoer[s]" and placed on them the burden of proving damages before they were found liable.

Rejecting these arguments in its posttrial order, the district court concluded that the instruction "was a proper statement of New York law."  J.A. 5575.  We review that conclusion de novo, *United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012), and affirm.  As the district court explained, under New York law, "where 'the non-breaching party has proven the *fact* of damages . . . , the burden of uncertainty as to the *amount* of damage is upon the wrongdoer.'"  J.A. 5576 (internal quotation marks omitted) (second emphasis added) (quoting *Process Am. Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016)); *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg, Inc.*, 487 F.3d

31

89, 111 (2d Cir. 2007); *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 392 (2d Cir. 2006). Here, because the court concluded on summary judgment that "Napoli and NBRS were liable" for breach of contract "based on the[ir] . . . incomplete accounting," which made the amount of damages uncertain, they were unquestionably "wrongdoers" under New York law, and "the burden on the amount owed rested with [them] as the breaching parties." J.A. 5576. The same was true of the Legacy Defendants and Napoli Firm Defendants so long as the jury first found them liable, as it was instructed to do before determining damages. *See* J.A. 3302. We see no reversible error in the burden of proof instruction.

## D.

Finally, the defendants nitpick the verdict form, insisting it should have allowed the jury to apportion damages among the different defendants. Declining the defendants' request for a verdict form that required the jury to make a separate damages finding as to each defendant, the district court instead issued a form that asked the jury to determine the "total settlement recovery" for the underlying asbestos clients' claims and the corresponding amounts, gross and net, owed to KLF. J.A. 3228. It then required the jury to decide for each defendant whether it was "liable" or "not liable" and, if liable, under which theory—"assignment" or "alter ego." J.A. 3228–3231.

"[T]he formulation of issues and the form of interrogatories [submitted to a jury] is committed to the sound discretion of the trial judge." *Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 284 (4th Cir. 1993) (internal quotation marks omitted). Here, the jury found that all the liable defendants were alter egos of NBRS, Napoli, or each other. Each

32

defendant was therefore liable for the entirety of the judgment, *see Sky Cable, LLC v. DirecTV, Inc.*, 886 F.3d 375, 385 (4th Cir. 2018), and any purported error in the verdict form was harmless.

## VI.

Chronologically, we have finally reached the district court's postverdict rulings. But our work is not done, as those rulings have spawned yet another half-dozen assignments of error by the parties on appeal.

## A.

As previously noted, the district court deferred its jurisdictional analysis for the Legacy Defendants and Napoli Firm Defendants until after trial. The jury found thirteen of those fifteen defendants liable. All thirteen were found liable under an alter-ego theory; twelve were also found liable under a theory of assignment. With the jury's liability findings in hand, the district court ruled in its posttrial order that the thirteen liable Legacy Defendants and Napoli Firm Defendants were subject to specific personal jurisdiction in Maryland, finding "sufficient evidence in the record to establish" not only that each of these defendants had individual contacts with that State but "were [also] alter-egos of Mr. Napoli and/or NBRS," over which the district court had already asserted personal jurisdiction. J.A. 5563; *see supra*, at 13–16.

On appeal, the Legacy Defendants and Napoli Firm Defendants contest this jurisdictional ruling, claiming that their contacts with Maryland are too sparse to support jurisdiction. We affirm. "When a company is an alter ego of" an individual, "the jurisdictional contacts of the individual *are* the jurisdictional contacts of the alter ego

33

entity." *Sky Cable*, 886 F.3d at 392 (internal quotation marks omitted and brackets omitted). The district court therefore did not err in "exercis[ing] personal jurisdiction vicariously" over the remaining law firm entities, *id.* at 391, irrespective of the facts that may have supported independent jurisdiction.

B.

In response to the defendants' motion to amend the judgment under Federal Rule of Civil Procedure 59(e), the district court held that the jury was permitted to apply an error rate to the settlement total, thereby increasing the damages owed to KLF. At the same time, the court determined that the error rate the jury applied was too speculative, and it reduced the judgment by applying a lower rate. This pair of rulings offends all parties on appeal, with the defendants challenging the first decision and KLF the second.

We review the district court's determinations on this front for an abuse of discretion. *See Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 672 (4th Cir. 2015). The district court appropriately determined that the jury was entitled to believe the testimony of KLF's expert Evans that some error was present in the defendants' data, rendering the use of an error rate multiplier permissible. Likewise, the court did not abuse its discretion in determining that the jury's error rate of 151 percent rested on a shaky foundation. *See* J.A. 5580–5581 (citing *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 334 (2d Cir. 1993), and *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 316 (S.D.N.Y. 2008)). As Evans himself acknowledged, portions of the data used to justify the 151 percent error rate were aberrant and should be "set . . . to the side" before calculating the overall rate of error in the defendants' data. J.A. 2086. The district court

34

did just that and, setting aside the outlier data, arrived at an error rate of 129 percent, which it then applied to the settlement amount found by the jury. We decline to disturb the district court's judgment in this regard.

C.

The district court further reduced the jury's verdict to account for KLF's settlement with Marc Bern. The defendants object to the district court's dollar-for-dollar setoff, arguing for a 50 percent reduction instead. And KLF objects to the district court's decision to reduce the verdict at all. We begin with some background necessary to understand this dispute before ultimately rejecting the parties' various contentions.

1.

As previously explained, NBRS is owned in equal parts by Napoli and nonparty Bern. After the two partners fell out, NBRS was placed into receivership and its cases were divided between them. The resulting Napoli–Bern settlement agreement allocated all 2,174 asbestos cases to Napoli and provided that Napoli would indemnify Bern against all "loses [sic], liabilities, damages, causes of action, claims, costs, and expenses" arising out of cases allocated to Napoli for conduct arising after the split. J.A. 5303. The agreement elsewhere provided that Napoli and Bern have a joint obligation with respect to "known and/or anticipated liabilities of [NBRS]." J.A. 5295. It also stated that if "either party pays more than 50% of [NBRS]'s debt, the party who has underpaid will indemnify the other with respect to that underpayment." J.A. 5296.

Fast forward to this lawsuit. KLF sued multiple defendants seeking payment under the association agreements, including the seventeen defendants involved in this appeal as

35

well as Bern and his law firm (the Bern Defendants). Realizing over the course of discovery that Napoli, not Bern, had been assigned the asbestos docket, KLF settled with the Bern Defendants in October 2019. In early 2020, the court-appointed receiver who was implementing the Napoli–Bern settlement ordered Bern to produce the 2019 KLF–Bern settlement agreement to Napoli. As produced, that agreement consisted of a single page providing that the Bern Defendants would pay a sum certain to settle KLF's claims. It also contemplated that KLF and the Bern Defendants would execute additional documents within twenty-one days, but no further documents were in fact executed until June 2020.

2.

Before the district court, the parties contested whether the jury's verdict should be offset to account for the KLF–Bern settlement. Invoking the New York General Obligations Law (NY-GOL), the defendants argued that the verdict should be reduced by 50 percent in accordance with the Napoli–Bern settlement agreement or, alternatively, by the dollar amount of the KLF–Bern settlement. KLF opposed, maintaining that the NY-GOL did not apply because Bern is not an "obligor" as the statute defines that term. KLF also contended that, because of certain language included in the June 2020 addendum, the non-settling defendants were not entitled to any setoff for the KLF–Bern settlement.

In its posttrial order, the district court agreed with the defendants that the NY-GOL applied, rejecting KLF's reading of "obligor." The court also rejected KLF's position that the KLF–Bern settlement prohibited any setoff by virtue of the June 2020 addendum, reasoning that the addendum was executed much later than twenty-one days after the original settlement and could not be considered part of the same agreement. Even so, the

36

court declined to offset the verdict by 50 percent as the defendants requested.  The court reasoned that, in the words of NY-GOL § 15-105, KLF "did not know or ha[ve] reason to know" that Bern "'did not pay so much of the claim as he was bound by his contract'" with Napoli.  J.A. 5586.  Indeed, the court observed, the Napoli–Bern settlement agreement appeared to require Napoli to indemnify Bern for liabilities arising out of the asbestos cases.  J.A. 5586.  The court concluded that another provision, NY-GOL § 15-103, applied and required a dollar-for-dollar setoff to reflect the settlement amount KLF received "from the Bern Defendants, who were co-obligors with the remaining . . . Defendants."  J.A. 5587; *see* NY-GOL § 15-103 ("The amount or value of any consideration received by the obligee from one or more of several obligors . . . in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors[.]").

3.

On appeal, the parties launch a bevy of arguments assailing the district court's ruling from all sides.  KLF contends that, for numerous reasons, the district court should not have reduced the jury's verdict and also posits that the court erred in considering the defendants' setoff claim at all because they failed to timely assert that defense in their pleadings.  The defendants insist that the district court erred in various ways by declining to apply NY-GOL § 15-105 to require a 50 percent reduction.

We are not persuaded to disturb the district court's ruling.  That court was in the best position to assess whether the defendants adequately asserted a setoff defense in their pleadings and, if not, whether entertaining that defense nevertheless would unduly

37

prejudice KLF. The court's decision to consider the defense was within its discretion. *See Core Commc'ns, Inc. v. Verizon Md. LLC*, 744 F.3d 310, 321 (4th Cir. 2014) (abuse of discretion review applies); *see also Reives v. Lumpkin*, 632 Fed. App. 34, 35 (2d Cir. 2016) (holding that district court did not abuse its discretion when it allowed a purportedly unpled defense that "share[d] a common factual nexus" with defenses that were pled). The court likewise reasonably determined that KLF's eight-month-delayed addendum was not "part of the same transaction as" the October 2019 KLF–Bern settlement. J.A. 5585 (quoting NY-GOL § 15-104). Nor do we discern any reversible error in the district court's decision to reduce the verdict, reflecting the money owed under the association agreements, by the amount the Bern Defendants paid toward the same obligation, *see* NY-GOL § 15-103— even though Bern's responsibility, if any, for the contingency fee payments vis-à-vis Napoli was at best unclear, *see* NY-GOL § 15-105.

## D.

At last, we arrive at the parties' final dispute in this appeal: whether the district court erred in entering judgment as a matter of law against KLF on its claim of constructive trust. We review this issue de novo, *Moskos v. Hardee*, 24 F.4th 289, 294 (4th Cir. 2022), and again affirm.

Under the terms of the association agreements, KLF was not the only referring firm entitled to a share of the gross recoveries from the asbestos cases; DLF was also entitled to a certain portion, generally 10 percent, of any settlement or verdict. The agreements stated that upon settlement of a client's claims, NBRS would send KLF "a single check . . .

38

representing [its] share of the attorneys' fees, as well as [DLF's] share." *E.g.*, J.A. 114. KLF would then write a check to DLF for its respective portion.

However, on the eve of trial, DLF sent a letter to the parties in this case confirming that it was "not a party to the Lawsuit and is not being represented by any counsel for the various parties. None of the parties or their counsel is authorized to speak for or act for [DLF]." J.A. 1306. The letter explained that DLF did not "want or expect any money by virtue of the Lawsuit" and thereby "relieve[d] KLF of the obligation, if any, to pay a portion of any recovery from the Lawsuit to [DLF]." J.A. 1306.

In its constructive trust claim, KLF argued that it was entitled to DLF's portion of the judgment award because it had a contractual right to collect from NBRS both its own share and DLF's share of the asbestos recoveries. The district court disagreed and, in a posttrial ruling, granted the defendants' motion for judgment as a matter of law on this claim. Because DLF's letter disavowed its interest in the case, disclaimed any party's right to collect fees on its behalf, and released KLF from its contractual obligations to DLF, the court found that KLF did "not have any legally cognizable claim to [DLF's] share." J.A. 3250. In fact, the court observed, there was no longer a DLF share to which KLF could assert a constructive trust.

On appeal, KLF renews the same contentions it made before the district court, arguing that the association agreements gave it an ownership interest in DLF's portion of the recovery and that DLF's letter did not extinguish KLF's right to collect that portion from the defendants. But the district court did not reversibly err in concluding otherwise.

39

KLF cannot assert an ownership interest on behalf of DLF that DLF no longer claims for itself.

## VII.

Faced with an appeal asserting thirteen grounds for reversal, Judge Craven of our Court once remarked that "[s]o many points of error suggest that none are valid." *United States v. Sawyers*, 423 F.2d 1335, 1338 (4th Cir. 1970). His observation applies with equal force here. The defendants offer twenty-one grounds for reversal and KLF another three. After carefully considering each one, we conclude that, with one minor exception, they all lack merit.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*